**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SHARON DIANE HOWETH,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 3:12-CV-979-P (BF)** |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying the claim of Sharon Diane Howeth ("Plaintiff") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI, respectively, of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief and the Commissioner's Response Brief. Plaintiff failed to file a Reply Brief and the time to do so has expired. The Court also reviewed the record in connection with the pleadings. For the reasons that follow, the Court recommends that the final decision of the Commissioner be **AFFIRMED**.

**Background**[1]

**Procedural History**

On January 12, 2006, Plaintiff filed her applications for DIB and SSI benefits. (Tr. 192-99.) In her applications, Plaintiff alleged a disability onset date of December 14, 2005, due to bipolar

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

disorder and diabetes. (Tr. 192-99, 243.) The applications were denied initially and again upon reconsideration. (Tr. 71-74.)

Plaintiff requested a hearing, which was held on December 18, 2007, before an Administrative Law Judge ("ALJ"). (Tr. 54-70.) Plaintiff, represented by counsel, testified at the hearing, along with a vocational expert, Barbara Dunlap ("VE"). (Tr. 54.) On May 22, 2008, the ALJ issued an unfavorable decision. (Tr. 78-86.) Plaintiff requested review from the Appeals Council, which was granted, and the Appeals Council remanded the case back to the ALJ on October 2, 2009. (Tr. 90-95.)

Upon remand, the ALJ held a second hearing on March 18, 2010. (Tr. 1028-077.) Plaintiff, represented by counsel, testified at the hearing, along with VE, Barbara Dunlap, and a medical expert, Dr. Alfred Jonas ("ME"), testified via telephone. (Tr. 1028.) The ALJ issued a partially favorable decision on May 17, 2010, finding that Plaintiff was not disabled within the meaning of the Act from her alleged onset date, December 14, 2005, to March 3, 2010. However, the ALJ found that Plaintiff became disabled on March 3, 2010. (Tr. 16-31.) Plaintiff requested review of this decision from the Appeals Council, but the request was denied on January 31, 2012. (Tr. 1-6.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on October 15, 1949, making her 56 years old at the time of her alleged onset date. (Tr. 192.) Plaintiff has a high school education. (Tr. 1032.) Plaintiff's past relevant work experience includes work as a travel agent and an airline reservation agent. (Tr. 1071-072.)

**Plaintiff's Relevant Medical Evidence[2]**

Dr. Elizabeth Hill, Treating Physician

Dr. Hill began treating Plaintiff in 2001. (Tr. 349.) Dr. Hill diagnosed Plaintiff with "Bipolar Depression." (Tr. 331.) She also treated Plaintiff for anxiety, diabetes, and asthma. (Tr. 332.) Plaintiff was initially prescribed Paxil, along with some other medications, but later she was prescribed Lexapro. (Tr. 333, 336-41, 342-44, 346-48.) Dr. Hill opined that Plaintiff understood the meaning of filing benefits, but could not manage her own benefits. (Tr. 330.) Dr. Hill also opined that Plaintiff was totally disabled because of her "Bipolar Depression." (Tr. 331.)

John Peter Smith Health Network ("JPS")

On January 10, 2006, a psychiatric evaluation of Plaintiff was performed at JPS. (Tr. 521-22.) The attending psychiatrist noted that Plaintiff was hospitalized in 2001 at HEB Springwood Hospital and diagnosed with bipolar affective disorder. (Tr. 521.) However, since that time Plaintiff had been responding well to lithium and lithobid. (Tr. 521.) The doctor noted that Plaintiff had good results with the medication and she improved significantly. (*Id.*) Plaintiff reported one other hospitalization. (*Id.*) A mental status examination revealed Plaintiff was in no acute physical distress, and she was awake, alert, cooperative, and appropriate. (Tr. 522.) Her mood was noted as mildly depressed, but Plaintiff's intellect, along with her short-term and long-term memory, were intact. (*Id.*) Plaintiff's insight and judgment were fair, and her thoughts were goal-oriented and did not reveal any evidence

---

[2] The Court notes that the arguments presented in Plaintiff's Brief center around her psychological issues. Accordingly, the Court will refrain from summarizing the medical evidence concerning Plaintiff's physical impairments.

of psychotic ideation. (*Id.*) Plaintiff was diagnosed with Bipolar disorder and she was assigned a Global Assessment of Functioning ("GAF") score of 40.[3] (Tr. 522.)

On January 17, 2006, a mental status examination revealed Plaintiff's appearance was neat, she was cooperative, her speech was normal, she had appropriate affect but a depressed mood, she was alert, her memory was intact, her concentration was good, she denied delusions or hallucinations, her thought processes were intact, and she had fair insight and judgment. (Tr. 475-76.) The attending psychiatrist opined that Plaintiff had less than moderate to moderate difficulties with daily activities, relationships, and social functioning. (Tr. 475.) Plaintiff was assigned a GAF score of 50.[4] (Tr. 476.)

On May 18, 2006, Plaintiff reported that her mood was better, she was getting along with family and friends, and her insight had improved a lot. (Tr. 470-71.) However, Plaintiff reported having hand tremors and a decrease in her memory and concentration. (Tr. 470.) A mental status examination revealed Plaintiff's appearance was neat, she was cooperative, her speech was normal, she had appropriate affect but a depressed mood, she was alert, her memory was intact, her concentration was good, she denied delusions or hallucinations, her thought processes were intact, and she had fair insight and judgment. (Tr. 470.) The attending psychiatrist opined that Plaintiff had

---

[3] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 31-40 is indicative of some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.*

[4] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. *See DSM.*

4

almost no difficulties to less than moderate difficulties with daily activities, relationships, and social functioning. (Tr. 470.) Plaintiff was assigned a GAF score of 55.[5] (Tr. 471.)

On June 1, 2006, Plaintiff admitted to relapsing on amphetamines in March. (Tr. 467.) Her mental status examination was fairly normal and her GAF remained at 55. (Tr. 468.) On August 30, 2006, Dr. Diana Mummert began treating Plaintiff and Plaintiff advised the doctor that she had been out of her medication for one week, except for Lithium. (Tr. 463.) A mental status examination revealed a depressed and angry mood, fair insight and judgment, moderate difficulties in relationships and social functioning, and less than moderate to moderate difficulties in daily activities. (*Id.*) Plaintiff's symptoms were rated as moderate and she was assigned a GAF score of 50. (Tr. 462-63.)

On August 31, 2006, Plaintiff was admitted to Harris Methodist Springwood Hospital ("Springwood") with her chief complaint being that she "was feeling depressed and lonely." (Tr. 401-12.) Plaintiff reported that she had not been taking her medication for the last week or so. (Tr. 401.) During a mental status examination, Plaintiff was alert, open, and cooperative. (Tr. 403.) Plaintiff stated that her mood was better and she denied suicidal or homicidal ideation, however, at the time of her admission to the hospital she was suicidal. (Tr. 403.) Plaintiff denied any physical or sexual abuse. (Tr. 402.) Her insight and judgment were fair during the examination. (Tr. 403.) Plaintiff was diagnosed with Bipolar disorder, type 1, and her GAF score was assessed at 35. (Tr. 404.) Plaintiff was discharged the following day, September 1, 2006. (Tr. 405.)

---

[5] A GAF score of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See DSM.*

At a follow-up appointment at JPS on September 6, 2006, Dr. Mummert evaluated Plaintiff and reported a normal mental status examination with good insight and judgment, no symptoms of bipolar disorder, and no symptoms of difficulties in daily activities, relationships, or social functioning. (Tr. 456-57.) Plaintiff reported that she had no complaints at the time. (Tr. 456.)

However, on September 26, 2006, Plaintiff was readmitted to Springwood for suicidal ideation. (Tr. 377.) Plaintiff "talked about her shadow and the tiger inside her" and that she felt the shadow was constantly after her. (*Id.*) However, at the time of her discharge, after she responded well to Geodon, Plaintiff reported that the shadow inside her did not exist. (*Id.*) Plaintiff's condition upon discharge was normal and she stated her mood was good. (Tr. 377-78.) Plaintiff was advised that she needed to be compliant with her medication. (Tr. 378.) Plaintiff's final diagnosis was Bipolar disorder, depressed, severe with psychotic features. (Tr. 376.) Plaintiff's GAF score was 45 to 50. (*Id*.)

A Psychiatric/Psychological Impairment Questionnaire was completed by Dr. Mummert on January 27, 2007. (Tr. 421-28.) Dr. Mummert diagnosed Plaintiff with Bipolar disorder, type I, mixed, and assigned her a GAF score of 60. (Tr. 421.) Dr. Mummert opined that Plaintiff was incapable of handling even low stress work and that Plaintiff would be absent from work more than three times a month. (Tr. 427-28.) Plaintiff was estimated to be markedly limited in several mental activities. (Tr. 423-25.)

On July 19, 2007, Plaintiff complained of occasional anxiety and she was started on Lyrica to relieve her anxiety. (Tr. 509.) Plaintiff was additionally prescribed Lithium and Trazodone. (*Id*.) On November 20, 2008, Plaintiff was seen for a follow-up wherein the doctor indicated that Plaintiff had minimal residual symptoms since her last visit, she had no new psychiatric problems, she had

minimal side effects from her medication, and she was intermittently taking her medication. (Tr. 580.) A mental status examination of Plaintiff revealed her appearance was neat, she was cooperative and had normal behavior, she had an appropriate mood with no depression or anxiety, she had fair concentration and an unimpaired memory, she was alert, her thought processes were well organized and intact, she denied delusions or hallucinations, and her insight and judgment were fair. (*Id.*) On this date, Plaintiff was rated borderline ill on the current psychiatric syndromic severity scale, which is one step lower than mildly ill and just one step higher than not ill at all. (Tr. 581.) Also, on the rating of global clinical improvement, Plaintiff was rated "much improved." (*Id.*) Plaintiff's GAF scored was assessed at 65.[6]

On January 8, 2009, Plaintiff reported that she ran out of her medicine, Lithium, 4-5 weeks ago, but she was feeling "fine" emotionally and she wanted to stay off Lithium because she was "just great" on her other medication. (Tr. 576.) Plaintiff's response to treatment was noted as "very much improved" and a mental status examination revealed the same results from November 20, 2008, only Plaintiff's insight and judgment were now rated as good. (*Id.*) Plaintiff's GAF score was 70 and Plaintiff was again rated borderline ill. (Tr. 577.) On March 24, 2009, Plaintiff complained of irritability and anger with a moderate return of her symptoms. (Tr. 574.) The doctor noted that Plaintiff was no longer taking Lithium due to stomach problems. (*Id.*) A mental status examination revealed mild depression and anxiety; moderate elevated mood; and fair concentration, judgment, and insight. (*Id.*) Otherwise the examination was unremarkable. (*Id.*) Her response to treatment was noted as worse since her last visit. (*Id.*) On September 7, 2009, Plaintiff complained of anxiety and

---

[6] A GAF score of 61-70 is indicative of mild symptoms or some difficulty in social, occupational, or school functioning. *See DSM.*

mania. (Tr. 620.) Thus, she was prescribed Zoloft, Trazodone, and Klonopin. (Tr. 621.) Her response to treatment was noted as "very much improved" and she was rated moderately ill on the psychiatric syndromic severity scale. (Tr. 621.) A mental status examination was unremarkable except for Plaintiff had mild anxiety and fair concentration, insight, and judgment. (Tr. 620.) Plaintiff's GAF score was assessed at 60. (Tr. 621.)

Dr. Jim Cox, State Agency Medical Consultant

A psychiatric review technique ("PRT") and mental residual functional capacity ("RFC") assessment was completed by Dr. Cox on March 6, 2006. (Tr. 350-67.) Dr. Cox diagnosed Plaintiff with Bipolar disorder and found her mildly limited in her daily living activities and in social functioning, and moderately limited in maintaining concentration, persistence, or pace. (Tr. 360.) The doctor found one or two episodes of decompensation. (*Id.*) Dr. Cox opined that Plaintiff retained the ability to remember detailed but not complex instructions and work-related activities. (Tr. 366.) He also found that she was able to sustain a work routine without special supervision, ask questions and request assistance, and avoid normal hazards. (*Id.*) The doctor opined that Plaintiff's alleged limitations were not fully supported by the evidence in the record. (*Id.*)

Dr. Tarakumar Reddy, Consultative Examiner

On June 28, 2006, Dr. Reddy conducted a psychiatric evaluation of Plaintiff. (Tr. 370-71.) Plaintiff's chief complaint was her bipolar disorder and she stated that she "ignore[d] medical help and [] paid the penalty." (Tr. 370.) A mental status examination revealed Plaintiff's psychomotor activity was within normal limits; she was alert and oriented to time, place, and person; her speech was coherent and relevant; she had no auditory or visual hallucinations; she had no delusions; her mood was depressed; she had a tearful affect; she was not suicidal or homicidal; her memory,

8

judgment, and insight were intact; she had poor concentration and an average intelligence; and her impulse control was good but her pace and persistence were slow. (*Id.*) Dr. Reddy noted that there was gradual deterioration within the past year and he diagnosed Plaintiff with Bipolar disorder, mixed, without psychotic features. (Tr. 371.) The doctor's prognosis was that Plaintiff was somewhat guarded and he assigned her a GAF score of 45. (*Id.*)

Dr. George Mount, Examining Psychologist

On March 3, 2010, Plaintiff presented to Dr. Mount for a clinical interview and mental status examination. (Tr. 583-94.) The doctor also administered the Millon Clinical Multiaxial Inventory-III ("MCMI-III") psychological assessment tool. (Tr. 586-94.) The doctor initially noted that Plaintiff was on-time for her appointment, she was dressed appropriately and groomed well, and she was cooperative and reliable. (Tr. 583.) Plaintiff told Dr. Mount that she was physically and sexually abused as a child and she last worked in 2004. (*Id.*) On the Beck Depression Inventory-II, Plaintiff's score was in the severe depression range. (Tr. 584.) On the Bipolar Spectrum Disorder Questionnaire, Plaintiff indicated that she has had more than one symptom at a time, and these symptoms have caused her a serious problem. (*Id.*) On the Beck Anxiety Inventory, Plaintiff scored in the moderate range. (*Id.*) The interpretive considerations from the capsule summary of the MCMI-III indicated that Plaintiff's response style may show a tendency to magnify illness, an inclination to complain, or feelings of extreme vulnerability associated with a current episode of acute turmoil. (Tr. 587.) The doctor also noted that Plaintiff's scale scores may be somewhat exaggerated, and that the interpretations should be read with this in mind. (*Id.*)

Plaintiff advised the doctor that her pain rates at a 9 without medication, and a 5 with medication, on a scale of 0 to 10 with 0 being no pain and 10 being high pain. (*Id.*) Regarding her

daily living activities, Plaintiff reported that she is able to care for her own personal hygiene, but her son helps her with the household chores and grocery shopping. (*Id.*) She watches television and manages her own funds, but she does not socialize outside her home. (*Id.*) The doctor noted that Plaintiff's judgment and reasoning were logical and functional, her insight was fair, and her prognosis was guarded. (Tr. 585.) The results of the MCMI-III indicated that Plaintiff was depressed and had an anxiety disorder. (*Id.*) Dr. Mount diagnosed Plaintiff with Bipolar I disorder, Post-Traumatic Stress disorder ("PTSD"), and psychoactive substance abuse in full remission. (*Id.*) The doctor assigned Plaintiff a GAF score of 46. (*Id.*)

On March 3, 2010, Dr. Mount also completed a Psychiatric/Psycholgical Impairment Questionnaire. (Tr. 596-603.) In the questionnaire, the doctor rated Plaintiff as markedly limited in many mental work-related activities. (Tr. 598-601.) Dr. Mount opined that Plaintiff was incapable of even low stress jobs, she would have good and bad days, she would be absent from work more than 3 times a month, and she could manage her own benefits. (Tr. 602-03.) The doctor also was of the opinion that the earliest date that Plaintiff's symptoms and limitations, as described in the questionnaire, could apply was 2004. (Tr. 603.)

**The Hearing**

Plaintiff, represented by counsel, testified on her own behalf at the second hearing held on March 18, 2010. (Tr. 1028-077.) Plaintiff stated that she last worked in December of 2005. (Tr. 1032.) Plaintiff testified that her typical day consists of sleeping, taking medicine, and talking to her family. (Tr. 1033.) Plaintiff stated that she does not participate in household chores due to the pain in her back and legs and her lack of concentration. (*Id.*) Plaintiff testified that her bipolar disorder has worsened since her first hearing before the ALJ. (Tr. 1034.) Plaintiff stated that she has the

following symptoms: suicidal thoughts, depression, lack of concentration, and anger issues. (*Id.*)

Plaintiff testified that she does not always take her medication regularly. (Tr. 1035.) Plaintiff testified

that she was hospitalized twice in 2006 for thoughts or attempts of suicide and once in 2007. (Tr.

1036.) When Plaintiff's counsel asked Plaintiff to describe her mood on average, Plaintiff stated "I

generally avoid interacting with others." (Tr. 1037.) Plaintiff testified to having an impaired memory

and racing thoughts. (Tr. 1038-039.) Plaintiff said that her son moved in to care for her a few years

ago and she never leaves the house alone. (Tr. 1039-040.) Plaintiff also testified that she is not

truthful to unfamiliar doctors and that she masks her feelings and condition to them. (Tr. 1042-043.)

Plaintiff said that she masks her condition so she appears to be doing better. (Tr. 1043.)

An ME, who is a psychiatrist, testified telephonically at the second hearing. (Tr. 1043-070.)

The ME testified that after reviewing all of the medical evidence in the record, Plaintiff did not

manifest symptoms which would meet or equal any listing for presumptive disability. (Tr. 1044.)

Regarding Plaintiff's functional limitations, the ME stated that Plaintiff had a moderate degree of

impairment overall in respect to her social functioning. (Tr. 1045-046.) Regarding her concentration,

persistence, and pace, the ME stated that it was not entirely clear if a degree of impairment was

visible. (Tr. 1046.) The ME also testified that the record revealed a low level of deterioration, or no

real deterioration at all. (Tr. 1047.) The ME recognized Plaintiff's hospitalizations but said they

weren't indicative of a significant problem because her stays at the hospital were uncomplicated and

her condition upon discharge was excellent. (*Id.*)

Upon cross-examination by Plaintiff's counsel, the ME stated that over the course of

Plaintiff's records, various doctors have indicated that Plaintiff has erratic thoughts. (Tr. 1059.) The

ME also stated that although Plaintiff has talked about thoughts of harming herself, the validity

behind these claims was uncertain. (Tr. 1060-061.) He explained that often it is difficult to understand these thoughts because they could be a call for help or overdramatic communication. (Tr. 1061.) The ME testified that an overnight hospitalization for suicidal thoughts was not consistent with someone who had severe depression with suicidal ideations. (Tr. 1066.) Regarding Plaintiff's pace and concentration, the ME stated that the records reflected a range of opinions from unimpaired to markedly impaired. (Tr. 1066-067.) The ME also testified that the record did not necessarily show that Plaintiff can only function in a low-stress or a no-stress setting. (Tr. 1067-068.)

The VE also testified at the hearing regarding jobs in the national economy. (Tr. 1070-077.) The ALJ posed the following hypothetical to the VE: assume an individual 60 years of age, high school educated, past relevant work as a travel agent and airline reservation agent, who has an RFC which would limit that individual to no interaction with the public and only incidental contact with co-workers. (Tr. 1072.) The ALJ then asked the VE whether this hypothetical person could perform Plaintiff's past relevant work. (*Id*.) The VE responded negatively but affirmed that Plaintiff gained transferable skills from her past relevant work such as: record keeping, reasoning, judgment, problem solving, clerical detail, keyboarding, and non-complex computer use. (*Id*.) The VE testified that these skills would transfer to jobs described as data entry, specifically, data entry clerks and clerical checkers. (Tr. 1072-073.) The VE testified that there are 4,000 to 6,000 data entry clerks in the state of Texas and 80,000 in the national economy. (Tr. 1072.) For clerical checkers, there are 6,000 to 8,000 in the state of Texas, and 90,000 or more positions in the national economy. (Tr. 1072-073.)

Upon cross-examination by Plaintiff's counsel, the VE testified that an individual who had moderate limitations but was not precluded from being able to maintain a schedule and keep routines would be able to complete the jobs she listed. (Tr. 1074.) However, the VE testified that an

individual who was markedly limited in work-related activities would be precluded from competitive employment. (Tr. 1074-075.)

**The ALJ's Decision**

On May 17, 2010, the ALJ issued a partially favorable decision. (Tr. 13-31.) In that decision, the ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[7] Before proceeding to step one, the ALJ determined that Plaintiff met the disability insured status requirements through the date of the decision. (Tr. 28.) At step one, the ALJ determined that Plaintiff had not engaged in substantial work activity since her December 14, 2005, alleged onset date. (*Id.*) At step two, the ALJ found that Plaintiff's bipolar disorder, diabetes mellitus, hypertension, hypothyroidism, and obesity were severe impairments. (*Id.*) However, at step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the requirements of any listed impairments for presumptive disability under the Social Security Regulations (the "Regulations"). (Tr. 28-29.)

Before proceeding to step four, the ALJ found that Plaintiff retained the RFC to perform a full range of light work with no other physical limitations or restrictions. (Tr. 29.) However, the ALJ additionally determined that Plaintiff could not have interaction with the public and she could only have incidental contact with co-workers. (*Id.*) At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (*Id.*) Finally, at step five, the ALJ found that as of December 14, 2005, Plaintiff was capable of performing other jobs that exist in significant numbers

---

[7] (1) Is the claimant currently working? (2) Does she have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent her from performing her past relevant work? (5) Does the impairment prevent her from doing any other work? 20 C.F.R. § 416.920.

in the national economy; however, as of March 3, 2010, the ALJ determined that Plaintiff was incapable of performing competitive work and she was therefore disabled. (Tr. 29-30.) Accordingly, the ALJ concluded that Plaintiff had been under a disability as defined in the Act since, but not before, March 3, 2010. (Tr. 30.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

14

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

## Issues

1. Whether the ALJ failed to properly consider if Plaintiff met medical listing 12.04 prior to March 3, 2010.

2. Whether the ALJ failed to follow the treating physician rule.

3. Whether the ALJ failed to properly evaluate Plaintiff's credibility.

4. Whether the ALJ relied upon flawed VE testimony.

## Analysis[8]

### Whether the ALJ failed to properly consider if Plaintiff met medical listing 12.04 prior to March 3, 2010

Plaintiff contends that the ALJ failed to properly consider whether she met or equaled the medical listing for affective disorders found in section 12.04 of Appendix 1 of the Regulations' Listing of Impairments. (Pl.'s Br. at 13-17.) Under the Regulations, a claimant can show that she is *per se* disabled if she meets or equals one of the listed impairments. 20 C.F.R. § 404.1520(d). The requirements for presumptive disability due to an affective disorder are found under listing 12.04:

Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or

---

[8] The Court notes that in many of Plaintiff's arguments, she cites to cases outside the Fifth Circuit. However, this Court will not address every case cited by Plaintiff since the Court is, of course, only bound by the precedent of higher Texas courts and the United States Supreme Court. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993).

c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

17

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. "To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). The Supreme Court has explained, "[f]or a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The Supreme Court further explained that the listings are set at a higher level of severity than the statutory standard, thus making it very difficult to meet this heightened standard. *Id.* at 532. "The listings define impairments that would prevent an adult . . . from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id.*

In her brief, Plaintiff argues that remand is required because the ALJ failed to adequately discuss medical listing 12.04 as it applied to Plaintiff's claim prior to March 3, 2010, and he failed to cite to any evidence to support his finding that she did not meet the listing before this date. (Pl.'s Br. at 17.) Plaintiff cites to *Audler v. Astrue* in support of her argument, however, she fails to mention that the Fifth Circuit held that remand was only required if the claimant's substantial rights had been affected by the ALJ's failure to discuss his step 3 analysis. *See Audler,* 501 F.3d 446, 448-49 (5th Cir. 2007) ("Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."). Thus, while it is true that an ALJ is required to identify the listed impairment for which the claimant fails to qualify and to provide an explanation, by discussing the evidence, as to how he reached that conclusion, remand is only required if the error was not harmless. *Id.* Regardless, the reasoning in the *Audler* case is inapplicable

18

here, as the ALJ identified the medical listings that Plaintiff did not meet and provided a lengthy discussion of the evidence that supported his conclusion.

Plaintiff avers that she met listing 12.04 prior to March 3, 2010, because her symptoms satisfied both the "A" and "B" criteria of the listing. (Pl.'s Br. at 15.) Specifically, Plaintiff contends that she met the criteria for (A)(3) and (B)(2)(3) prior to March 3, 2010, based upon the report from Dr. Mount. (*Id.* at 14-15.) In his report, Dr. Mount opined that Plaintiff was markedly limited in several abilities, including her ability to relate to the general public, supervisors, and co-workers; maintain attention and concentration for extended periods; and complete a normal workweek and perform at a consistent pace. Dr. Mount additionally opined that Plaintiff had been suffering from these symptoms since 2004. While the ALJ did rely on Dr. Mount's report to find that Plaintiff met listing 12.04 as of March 3, 2010, the date Dr. Mount evaluated Plaintiff, he did not find that the medical evidence in the record supported a finding that Plaintiff met the listing prior to that date. Instead, the ALJ found that Plaintiff was only moderately limited in her ability to maintain social functioning and mildly limited in her ability to maintain concentration, persistence, or pace. (Tr. 29.) Contrary to Plaintiff's assertion, although not listed on the exact same page in his decision, the ALJ cited to evidence to support this finding. Furthermore, substantial evidence supports the ALJ's conclusion that Plaintiff did not meet listing 12.04 prior to March 3, 2010.

A psychiatric evaluation at JPS on January 10, 2006, showed Plaintiff was responding well to her medication, lithium and lithobid, and Plaintiff had good results with the medication, as she had improved significantly. An impairment that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability. *See Johnson v. Bowen,* 864 F.2d 340, 348 (5th Cir. 1988). A mental status examination on that date revealed Plaintiff was in no acute physical

distress, and she was awake, alert, cooperative, and appropriate. Her mood was noted as mildly depressed, but Plaintiff's intellect, along with her short-term and long-term memory, were intact. Plaintiff's insight and judgment were fair, and her thoughts were goal-oriented and did not reveal any evidence of psychotic ideation. A subsequent examination on January 17, 2006, revealed Plaintiff's appearance was neat, she was cooperative, her speech was normal, she had appropriate affect but a depressed mood, she was alert, her memory was intact, her concentration was good, she denied delusions or hallucinations, her thought processes were intact, and she had fair insight and judgment. The attending psychiatrist opined that Plaintiff had less than moderate to moderate difficulties with daily activities, relationships, and social functioning.

On May 18, 2006, Plaintiff reported to JPS that her mood was better, she was getting along with family and friends, and her insight had improved a lot, but she was experiencing a decrease in her memory and concentration. A mental status examination revealed Plaintiff's appearance was neat, she was cooperative, her speech was normal, she had appropriate affect but a depressed mood, she was alert, her memory was intact, her concentration was good, she denied delusions or hallucinations, her thought processes were intact, and she had fair insight and judgment. The attending psychiatrist opined that Plaintiff had almost no difficulties to less than moderate difficulties with daily activities, relationships, and social functioning.

On August 30, 2006, Dr. Mummert began treating Plaintiff. A mental status examination revealed a depressed and angry mood, fair insight and judgment, moderate difficulties in relationships and social functioning, and less than moderate to moderate difficulties in daily activities. At a follow-up appointment, Plaintiff had a normal mental status examination with good insight and judgment, no symptoms of bipolar disorder, and no symptoms of difficulties in daily

activities, relationships, or social functioning. On November 20, 2008, a mental status examination revealed Plaintiff's appearance was neat, she was cooperative and had normal behavior, she had an appropriate mood with no depression or anxiety, she had fair concentration and an unimpaired memory, she was alert, her thought processes were well organized and intact, she denied delusions or hallucinations, and her insight and judgment were fair. Plaintiff was rated borderline ill on the current psychiatric syndromic severity scale, which is one step lower than mildly ill and just one step higher than not ill at all. Also, on the rating of global clinical improvement, Plaintiff was rated "much improved." On January 8, 2009, Plaintiff's response to treatment was noted as "very much improved" and a mental status examination revealed the same results from November 20, 2008, only Plaintiff's insight and judgment were now rated as good. Plaintiff was again rated borderline ill. On March 24, 2009, the doctor noted that Plaintiff was no longer taking Lithium and a mental status examination revealed mild depression and anxiety; moderate elevated mood; and fair concentration, judgment, and insight. Otherwise the examination was unremarkable. On September 7, 2009, Plaintiff's response to treatment was noted as "very much improved" and she was rated moderately ill on the psychiatric syndromic severity scale. A mental status examination was unremarkable except for Plaintiff had mild anxiety and fair concentration, insight, and judgment.

A PRT and mental RFC assessment was completed by Dr. Cox on March 6, 2006. Dr. Cox found Plaintiff mildly limited in her daily living activities and in social functioning, and moderately limited in maintaining concentration, persistence, or pace. The doctor found one or two episodes of decompensation. Subsequently, on June 28, 2006, Dr. Reddy conducted a psychiatric evaluation of Plaintiff. A mental status examination revealed Plaintiff's psychomotor activity was within normal limits; she was alert and oriented to time, place, and person; her speech was coherent and relevant;

21

she had no auditory or visual hallucinations; she had no delusions; her mood was depressed; she had

a tearful affect; she was not suicidal or homicidal; her memory, judgment, and insight were intact;

she had poor concentration and an average intelligence; and her impulse control was good but her

pace and persistence were slow.

Finally, at the hearing, the ME testified that after reviewing all of the medical evidence in the

record, Plaintiff did not manifest symptoms which would meet or equal any listing for presumptive

disability. Regarding Plaintiff's functional limitations, the ME stated that Plaintiff had a moderate

degree of impairment overall in respect to her social functioning. Regarding her concentration,

persistence, and pace, the ME stated that it was not entirely clear if a degree of impairment was

visible. The ME explained that the records reflected a range of opinions from unimpaired to

markedly impaired. The ME also testified that the record revealed a low level of deterioration, or no

real deterioration at all. The ME recognized Plaintiff's hospitalizations but said they weren't

indicative of a significant problem because her stays at the hospital were uncomplicated and her

condition upon discharge was excellent. Additionally, one of Plaintiff's hospitalizations was just for

one night and the ME explained that an overnight hospitalization for suicidal thoughts was not

consistent with someone who had severe depression with suicidal ideations.

In his decision, the ALJ specifically stated that Plaintiff did not have an impairment, or

combination of impairments, which met or equaled listing 12.04. (Tr. 28.) He explained that Plaintiff

did not meet the "B" criteria prior to March 3, 2010, and he gave a lengthy discussion of the relevant

medical evidence which supported this determination. (*See* Tr. 21-24, 29.) The only piece of

evidence that supported Plaintiff experiencing *one* marked limitation in the functional domains of

the "B" criteria was a mental impairment questionnaire that was completed by her treating

psychiatrist, Dr. Mummert. However, the ALJ ultimately rejected this opinion. Notwithstanding, Dr. Mummert's opinion does not substantiate a finding that Plaintiff met the "B" criteria because one marked limitation does not suffice unless Plaintiff was also experiencing repeated episodes of decompensation. Dr. Mummert's opinion fails to indicate whether Plaintiff experienced such episodes. Dr. Mummert actually only found Plaintiff moderately limited in social functioning, which coincides with the ALJ's finding, but does not support Dr. Mount's opinion. There simply is no evidence that exists prior to March 3, 2010, that substantiates Dr. Mount's opinion or that supports a finding that Plaintiff met listing 12.04.

Plaintiff contends that "[t]he ALJ's finding that Ms. Howeth suddenly became disabled on the date of Dr. Mount's evaluation is arbitrary and capricious," and constitutes reversible error pursuant to *Spellman v. Shalala,* 1 F.3d 357 (5th Cir. 1993). (Pl.'s Br. at 15-16.) However, *Spellman* is distinguishable from the case at hand. In *Spellman,* the Fifth Circuit explained that there are three factors to consider in determining the claimant's onset date of disability: the individual's allegation, their work history, and the medical evidence, with medical evidence being the most significant factor. *Id.* at 361. The Fifth Circuit remanded the case back to the Commissioner because there was no medical evidence to support the claimant's onset date of disability as ascribed by the ALJ, thus making it unclear as to when the claimant's mental impairment began to limit her functional capacity. *Id.* at 363-65. Here, on the other hand, there is sufficient medical evidence to support the ALJ's determination of Plaintiff's onset date of disability. In his decision, the ALJ explained that he did not relate Dr. Mount's report back to 2004 because (1) Plaintiff worked at the substantial gainful activity level through 2005, (2) Plaintiff did not even allege that she became disabled until December 14, 2005, and (3) the medical evidence, including the ME's testimony, did not support an onset date

of disability prior to the date of Dr. Mount's evaluation. (Tr. 28.) Thus, whereas in *Spellman,* the Commissioner utilized a lack of evidence to support a later onset date of disability, here, there was a sufficient amount of evidence during the relevant time period, however, the evidence supported a later onset date of disability than that alleged by Plaintiff.

Plaintiff's argument that the ALJ was required to consider Dr. Mount's retrospective opinion pursuant to *Likes v. Callahan,* 112 F.3d 189 (5th Cir. 1997), is unavailing as well. In *Likes,* the Fifth Circuit remanded the case back to the Commissioner because the ALJ failed to mention the retrospective medical opinions. *Id.* at 191. Here, the ALJ clearly considered Dr. Mount's retrospective opinion, but disregarded it for several plausible reasons. *See supra.* The Court finds that substantial evidence supports the ALJ's determination that Plaintiff did not have any marked limitations in the functional domains of the "B" criteria prior to March 3, 2010, and, thus, she did not meet listing 12.04. Accordingly, remand is not required.

**Whether the ALJ failed to follow the treating physician rule**

Plaintiff alleges that the ALJ failed to follow the treating physician rule when he rejected the opinion of her treating psychiatrist, Dr. Mummert. (Pl.'s Br. at 17-21.) The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight in determining disability. *See Newton,* 209 F.3d at 455 (citing *Leggett,* 67 F.3d at 566; *Greenspan,* 38 F.3d at 237). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). On the other hand "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating

24

physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456. If good cause is shown, then the ALJ may accord the treating physician's opinion less weight, little weight, or even no weight. *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1995). If the ALJ does not accord a treating doctor's opinion controlling weight, the ALJ must set forth specific reasons for the weight given, supported by the medical evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2). If a contradictory opinion from another expert does not exist, the Regulations require the ALJ to consider specific factors before deciding that a treating physician's opinion will not be given controlling weight.[9] *Newton*, 209 F.3d at 453.

In this case, the ALJ rejected the opinion of Dr. Mummert and he set forth specific reasons for doing so in his decision. (Tr. 23.) On January 27, 2007, Dr. Mummert, who had been treating Plaintiff for approximately five months, provided an opinion regarding Plaintiff's ability to perform work-related activities, essentially opining that Plaintiff would be precluded from maintaining competitive employment. Specifically, Dr. Mummert found that Plaintiff was incapable of handling even low stress work and that Plaintiff would be absent from work more than three times a month. The doctor also opined that Plaintiff was markedly limited in several mental activities, including her ability to maintain attention and concentration for extended periods and her ability to complete a normal work-week and perform at a consistent pace. Dr. Mummert was of the opinion that these

---

[9] These factors include: 1) the physician's length of treatment of the plaintiff, 2) the physician's frequency of examination, 3) the nature and extent of the treatment relationship, 4) the support of the physician's opinion afforded by the medical evidence of record, 5) the consistency of the opinion with the record as a whole, and 6) the specialization of the treating physician. 20 C.F.R. § 404.1527(c)(2).

limitations commenced, at the earliest, on August 30, 2006, which is also the date that the doctor began treating Plaintiff.

In his decision, the ALJ explained that he could not accept this opinion because (1) there was no indication that Dr. Mummert was aware of the entire body of medical evidence; (2) the questionnaire that Dr. Mummert completed was furnished by Plaintiff's counsel and, thus, was "not prepared for legitimate medical purposes of diagnosis or treatment" or in the course of an examination of Plaintiff; (3) Dr. Mummert did not relate her clinical findings or Plaintiff's subjective complaints to the proposed limitations; (4) Dr. Mummert was a resident doctor who was supervised by a fully licensed psychiatrist, however, this psychiatrist did not endorse the questionnaire; and (5) the opinion was inconsistent with prior, contemporaneous, and subsequent treatment notes. In her brief, Plaintiff questions the validity of several of the reasons cited by the ALJ for discounting Dr. Mummert's opinion. (Pl.'s Br. at 18-20.) While the Court agrees that some of these factors, standing alone, would not provide the requisite good cause to discredit Dr. Mummert's opinion, the ALJ simply considered these factors *in addition to* consideration of the overall objective medical evidence. Because Dr. Mummert's opinion is not supported by the medical evidence in the record, the ALJ could properly discount the weight of her opinion. *See Newton*, 209 F.3d at 456.

Dr. Mummert was of the opinion that Plaintiff essentially became disabled as of August 30, 2006. This date coincides with Plaintiff's hospitalizations at Springwood on August 31, 2006, and September 26, 2006, both of which were related to Plaintiff's non-compliance with her medication. On August 31, 2006, Plaintiff reported that she was feeling depressed and lonely and that she had been off her medication for the last week or so. On September 26, 2006, Plaintiff was advised of the importance of being compliant with her medication. Plaintiff was admitted to the hospital on August

26

31, but she was released the very next day, September 1, 2006. Upon release, Plaintiff stated that her mood was better and she denied any suicidal or homicidal ideation. Similarly, although Plaintiff was hospitalized for a few days after her admittance on September 26, 2006, Plaintiff was again discharged in normal condition and with a good mood. Although Plaintiff initially had reported hallucinations regarding a shadow and tiger insider her, Plaintiff responded well to Geodon, and denied hallucinations upon her discharge.

Plaintiff's non-compliance with her medication is not only apparent from her hospitalizations, but also from her treatment records at JPS. In fact, the date upon which Dr. Mummert opined that Plaintiff's limitations commenced, Plaintiff reported to the doctor that she had been off her medication, except for Lithium, for one week. Additionally, on November 20, 2008, the psychiatrist noted that Plaintiff was taking her medication intermittently. On January 8, 2009, Plaintiff reported that she quit taking Lithium 4 or 5 weeks ago but she was feeling fine and so she wanted to stay off Lithium. In her consultative examination with Dr. Reddy, Plaintiff told the doctor that she had ignored medical help and now she was paying the penalty.

Treatment notes from JPS do not support Dr. Mummert's proposed limitations. A psychiatric evaluation on January 10, 2006, revealed that Plaintiff was responding well to her medication and that she had improved significantly. She also had an unremarkable mental status examination except for mild depression. In fact, Plaintiff's mental status examinations at JPS from January 10, 2006, through September 7, 2009, were, for the most part, unremarkable. Additionally, on several occasions, Plaintiff was rated as having no difficulties or less than moderate to moderate difficulties in daily activities, relationships, and social functioning. Furthermore, on September 6, 2006, just one week after Dr. Mummert opined that Plaintiff essentially became disabled, her treatment notes reflect

27

a normal mental status examination with no symptoms of bipolar disorder and no symptoms of difficulties in daily activities, relationships, or social functioning. Additionally, treatment notes subsequent to Dr. Mummert's January 27, 2007, opinion reflect that Plaintiff was rated as borderline ill on the psychiatric syndromic severity scale, which is one step lower than mildly ill and just one step higher than not ill at all. Further, Plaintiff's clinical improvement was repeatedly rated as much improved.

Plaintiff's argument that the ALJ was required to analyze the § 404.1527(c)(2) factors lacks merit. In rejecting Dr. Mummert's opinion, the ALJ cited to competing first-hand medical evidence which contradicted the doctor's opinion. Accordingly, a detailed analysis of the factors was not required. *See Newton,* 209 F.3d at 455-57. Moreover, the ALJ did consider several of the factors, including the specialization of Dr. Mummert, the consistency of the doctor's opinion with the record as a whole, and the support of Dr. Mummert's opinion afforded by the evidence in the record. Additionally, contrary to Plaintiff's contention, the remaining factors do not weigh in favor of crediting Dr. Mummert's opinion. (*See* Pl.'s Br. at 20.) Plaintiff's characterization of Dr. Mummert as her "long-time treating psychiatrist" and Plaintiff's statement that Dr. Mummert treated Plaintiff on a regular basis for several years is simply not accurate. (*Id.* at 18, 20.) In fact, Plaintiff concedes that Dr. Mummert did not begin treating Plaintiff until August 30, 2006. (*Id.* at 4.) Thus, when Dr. Mummert provided her opinion on January 27, 2007, the doctor had only been treating Plaintiff for five months. Furthermore, in her opinion, Dr. Mummert noted that Plaintiff's last examination was on November 22, 2006, and her frequency of treatment was once a month. Thus, Dr. Mummert had only examined Plaintiff a handful of times before providing her opinion.

The Court finds that the ALJ provided the requisite good cause for discrediting the opinion

28

of Dr. Mummert. The ALJ rejected Dr. Mummert's opinion for several reasons, but the primary reason was because the opinion was inconsistent with the other evidence in the record and inconsistent with Dr. Mummert's own contemporaneous treatment notes.[10] Substantial evidence supports the ALJ's decision to reject the opinion of Dr. Mummert.

**Whether the ALJ failed to properly evaluate Plaintiff's credibility**

Plaintiff contends that the ALJ failed to properly evaluate her credibility and, thus, his finding that her testimony was not entirely credible is not supported by substantial evidence. (Pl.'s Br. at 21-23.) When a claimant establishes the existence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of those symptoms to determine the extent to which they affect the individual's ability to do basic work activities. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). This requires the ALJ to make a finding concerning the credibility of the claimant's statements about the symptoms and their functional effects. *Id.* "The ALJ's findings regarding the debilitating effect of the subjective complaints are entitled to considerable judicial deference." *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986). However, the ALJ must articulate credible and plausible reasons for rejecting subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

---

[10] The Court notes that the ALJ recognized that Dr. Mummert's opinion was somewhat substantiated by the opinion of Dr. Hill, a non-psychiatrist family physician. (Tr. 22.) However, as the ALJ correctly pointed out, Dr. Hill's conclusory statement that Plaintiff was permanently disabled was not a medical opinion for which the ALJ was required to consider. *See Frank v. Barnhart,* 326 F.3d 618, 620 (5th Cir. 2003). Dr. Hill's opinion was a legal conclusion as to the ultimate issue of disability, which is a determination expressly reserved to the Commissioner. *See id.* Accordingly, Dr. Hill's opinion had no special significance in the ALJ's determination.

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, and he cited several reasons to support this determination. (Tr. 20-21.) The ALJ explained that he found Plaintiff to have poor credibility because of her conflicting statements, non-compliance with medication, and her overall poor work record. (Tr. 20.) In her daily activity questionnaire, submitted to the Commissioner on February 1, 2006, Plaintiff indicated that she had extreme difficulties dealing with people and that she had confrontations with her family and, thus, she was estranged from all of her family except her son and daughter. (Tr. 256.) The ALJ found that this statement conflicted with a letter from American Airlines wherein the hearing officer recognized that some of Plaintiff's absences from work were due to family problems. (Tr. 260.) The ALJ asserted that this letter suggested that Plaintiff may have been closer with her family than what she reported in the questionnaire. (Tr. 20.) Regarding her non-compliance with medication, the Court previously listed several occasions where Plaintiff reported to JPS and Springwood that she was off her medication. Additionally, Plaintiff testified at the hearing that she does not always take her medication regularly. Non-compliance with medication is a proper factor for the ALJ to consider in assessing a claimant's credibility. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). The ALJ also cited Plaintiff's overall poor work record as a factor suggesting that she was not entirely credible. The ALJ again referred to the letter from American Airlines wherein the hearing officer outlined Plaintiff's history of unsatisfactory attendance, which dated back to Plaintiff's first termination on September 10, 1999. (*See* Tr. 259-61.)

Finally, and most importantly, the ALJ explained that Plaintiff's admission of deceptive acts at the hearing damaged her credibility such that the ALJ could not assign probative value to her testimony and other statements. (Tr. 21.) At the hearing, Plaintiff testified that she was not truthful

to unfamiliar doctors and that she masked her condition and feelings to them. Plaintiff stated that she masked her condition by downplaying her symptoms. Plaintiff additionally argues that the ALJ did not consider the factors outlined in SSR 96-7p when assessing Plaintiff's credibility. (Pl.'s Br. at 21, 23.) This argument is unfounded as the ALJ specifically recognized the SSR 96-7p factors, and listed the factors that he considered in his determination. (*See* Tr. 21.)

An ALJ's evaluation of the credibility of a claimant's subjective complaints is entitled to judicial deference so long as it is supported by substantial evidence. *Villa,* 895 F.2d at 1024. The Court finds that substantial evidence supports the ALJ's credibility determination. The ALJ articulated several specific, plausible reasons for not finding Plaintiff's statements regarding the severity of her symptoms entirely credible. This Court, therefore, gives deference to the ALJ's credibility determination.

**Whether the ALJ relied upon flawed VE testimony**

Plaintiff contends that the ALJ posed a defective hypothetical question to the VE, thereby rendering the VE's resulting testimony that Plaintiff was capable of performing other jobs in the national economy flawed. (Pl.'s Br. at 23-25.) Specifically, Plaintiff avers that the ALJ should have included limitations from the opinion of Dr. Mummert and limitations regarding Plaintiff's moderate difficulties in social functioning and mild difficulties in concentration, persistence, or pace into his hypothetical question. (*Id.* at 23-24.)

The hypothetical question that the ALJ posed to the VE, and upon which the ALJ relied in finding Plaintiff capable of performing the occupations of a data entry clerk and a clerical checker prior to March 3, 2010, included limitations such that the individual would have no interaction with

the public and only incidental contact with co-workers. The ALJ must incorporate all of a claimant's disabilities supported by the evidence in the record and recognized by the ALJ into his hypothetical question. *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002). As the Court has previously explained, the ALJ rejected the opinion of Dr. Mummert because it was not supported by the medical evidence in the record and, thus, he was not required to incorporate limitations that the doctor found into his hypothetical question. Additionally, Plaintiff's argument that the ALJ should have included limitations regarding her difficulties in social functioning and in concentration, persistence, or pace lacks merit. The ALJ incorporated limitations regarding Plaintiff's moderate difficulties in social functioning when he limited Plaintiff to no interaction with the public and only incidental contact with co-workers. Furthermore, it would be nonsensical for the ALJ to include limitations regarding Plaintiff's concentration, persistence, or pace when he only found Plaintiff to be mildly limited in that area. According to a questionnaire created by Plaintiff's counsel, mild limitations do not significantly affect an individual's ability to perform the activity. (Tr. 423.) Plaintiff fails to cite to any Fifth Circuit case law to support her contention and this Court similarly has found none.

The Court finds that the hypothetical question posed to the VE incorporated all of Plaintiff's disabilities which the ALJ found to be supported by the evidence in the record. Accordingly, the ALJ could properly rely on the VE's testimony that Plaintiff was capable of performing the occupations of a data entry clerk and a clerical checker prior to March 3, 2010. Therefore, the ALJ's step 5 determination is supported by substantial evidence.

### Recommendation

For the foregoing reasons, the Court recommends that the District Court **AFFIRM** the decision of the Commissioner, as it is supported by substantial evidence and the ALJ did not commit prejudicial legal error, and dismiss Plaintiff's Complaint with prejudice.

**SO RECOMMENDED**, September 12, 2013.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).