IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHARON DIANE HOWETH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 12-CV-0979-P |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security,[1] | § | |
| | § | |
| Defendant. | § | |

## ORDER PARTIALLY ACCEPTING FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

On September 12, 2013, the assigned Magistrate Judge issued Findings, Conclusions, and Recommendation ("FCR") in which he recommended that the Court affirm the Commissioner's decision. Plaintiff timely objected to the recommendation. (*See* Pl.'s Obj'ns to FCR [hereinafter Obj'ns], doc. 15.) She urges the Court to reverse the decision of the Commission and remand her case for further proceedings. (*Id.* at 6.) The Commissioner has not responded to the objections. For the reasons that follow, the Court accepts the FCR in part and rejects it in part as stated herein after reviewing all relevant matters of record, including the FCR and the filed objections, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(3).

## I.     Authority of Magistrate Judge and Standard of Review

Section 636(b)(1)(B) of Title 28 of the United States Code grants magistrate judges authority to issue findings and recommendations regarding dispositive motions in cases referred to them. The statute provides for the filing of written objections to proposed findings and recommendations and

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), she is automatically substituted as the defendant in this action.

for a de novo determination of matters "to which objection is made."  Objections asserted in accordance with this provision serve "to narrow the dispute" and enable district judges "to focus attention on those issues – factual and legal – that are at the heart of the parties' dispute."  *Thomas v. Arn*, 474 U.S. 140, 147 & n.6 (1985).

Rule 72(b)(3) of the Federal Rules of Civil Procedure likewise provides for a de novo determination of "any part of the magistrate judge's disposition that has been properly objected to."  Rule 72(b)(2) requires the objecting party to file "specific written objections" and grants other parties fourteen days to respond to such objections.

Consistent with § 636(b)(1) and Rule 72(b)(3), the Court reviews the findings and recommendation of the Magistrate Judge in this case.  It "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *accord* 28 U.S.C. § 636(b)(1).

## II.    Background

The Magistrate Judge set out a thorough and detailed background of the procedural history, medical evidence,[2] testimony at the hearing before the Administrative Law Judge ("ALJ"), and the ALJ's decision that became the final decision of the Commissioner.  (*See* FCR at 1-14.)  The Court will not restate the entirety of that background here.  But the following brief summary places the issues and objections in the proper context.

Plaintiff alleges that she became disabled on December 14, 2005, due to a bipolar disorder[3]

---

[2]As recognized by the Magistrate Judge, the issues in this case center around Plaintiff's psychological issues. (*See* FCR at 3 n.2.)  There is thus no need to summarize medical evidence related to any physical impairment.

[3]Although Plaintiff listed bipolar disorder as her only mental impairment, the ALJ often refers to "mental impairments."  (*See* Tr. at 29-30.)  Consequently, the Court will often speak in terms of multiple mental impairments.

and diabetes.  (Tr. at 192, 195, and 243.)  The ALJ found that Plaintiff satisfied the Step 3 criteria

for disability as of March 3, 2010, but not before that date.[4]  (Tr. at 29-30.)  The ALJ referred to this

latter date as the "established onset date," (Tr. at 19), and disability after this date is not in dispute.

The ALJ referred to the period between the alleged onset date and the established onset date as "the

interim period."  (*Id.*)  And he found that Plaintiff was able to perform various jobs during the inter-

im period that were available in significant numbers in the national economy, but she could not per-

form her past relevant work as a travel agent or airline reservation clerk.  (Tr. at 29-30.)  He thus

found Plaintiff not disabled during the interim period at Step 5 of the evaluative sequence.  Further-

more, as will be seen later in this order, the psychiatric evidence splits the interim period into two

parts as of August 30, 2006, the date Plaintiff's treating psychiatrist, Diana Mummert, M.D., identi-

fies as the earliest date that symptoms and limitations set out in her report applied.  (*See* Tr. at 428.)

## III.   Objections

Plaintiff objects to each finding of the Magistrate Judge.  (Obj'ns at 1.)  More specifically,

she objects to finding that the ALJ properly (1) considered Medical Listing 12.04 for the relevant

period at issue;[5] (2) applied the treating physician rule; (3) evaluated her credibility; and (4) relied

upon vocational expert testimony.  (*Id.* at 1-6.)  After conducting a de novo review of these issues

as required by § 636(b)(1) and Rule 72(b)(3), the Court accepts the FCR in part, rejects it in part, and

reverses the decision of the Commissioner.

---

[4]At Step 3 of the five-step evaluative sequence used to determine whether an adult claimant is disabled, the Commissioner must determine whether the claimant has an impairment that meets or equals one of the listings in appendix 1 to subpart P of part 404 of the regulations.  *Randall v. Astrue*, 570 F.3d 651, 653 (5th Cir. 2009).

[5]Listing 12.04 addresses bipolar and other affective disorders.  20 C.F.R. Pt. 404, App. 1, Subpt. P § 12.04.

A.   __Credibility__

The ALJ found Plaintiff not credible.  (Tr. at 29.)  Before doing so he noted conflicting statements by Plaintiff, non-compliance with medication, and an overall poor work record.  (Tr. at 20.)  The Magistrate Judge found that the ALJ properly determined Plaintiff's credibility.  (FCR at 29-31.)  Plaintiff objects that the ALJ ignored the possibility that her inaccurate statements and non-compliance with medication are properly attributed to her mental impairment rather than indicating a lack of credibility or severity in her condition.  (Obj'ns at 5.)  She further objects that her earnings record reflects an honorable work history prior to her becoming disabled in December 2005.  (*Id.* at 6.)

As properly recognized by the Magistrate Judge, an ALJ's credibility determination "is entitled to judicial deference if supported by substantial record evidence."  (FCR at 31 (citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)).  Substantial evidence "is more than a mere scintilla and less than a preponderance.  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision."  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  Despite Plaintiff's objections, substantial evidence supports the ALJ's credibility finding.  As the Magistrate Judge recognized as most important, Plaintiff admitted at the hearing before the ALJ that she would at times act deceptively so as to mask her condition and feelings to unfamiliar doctors in an effort to present her condition as better than it was.  (*See* FCR at 30-31, Tr. at 1042-43.)  The ALJ found this admission "so damaged her credibility that [he could not] assess probative value to her testimony and other statements."  (Tr. at 21.)  This admission of deceptive acts constitutes substantial evidence to support an adverse credibility finding.

Plaintiff quarrels with the ALJ's criticism that she had an "overall poor work record."  (Obj'ns at 6.)  She contends that her earnings record shows an honorable work history, which consti-

4

tutes strong evidence of her credibility when claiming an inability to work. (*Id.*) Although an honorable work history may indeed weigh in favor of finding a claimant credible, *see Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983), it is merely one of many factors to be considered when assessing credibility, *Gittens v. Astrue*, No. 12 Civ. 3224-NSR-GAY, 2013 WL 4535213, at *9 (S.D.N.Y. Aug. 26, 2013) (accepting recommendation of Mag. J.). Even if the earnings record shows an honorable work history in this case, that history does not make Plaintiff's admission of deceptive acts insubstantial. That admission alone is adequate to support the ALJ's credibility finding. Plaintiff's earnings record, furthermore, does not appear as strong as she suggests.[6] (*See* Tr. at 200-01.) And, as the ALJ specifically pointed out, the administrative record shows that Plaintiff was twice terminated for poor attendance, but was reinstated on a probationary basis after the first termination. (Tr. at 19-20.) Plaintiff maintained satisfactory attendance for the two-year probationary period – only slipping into excess absences two months after the period expired. (*Id.*) Despite her earnings record, substantial evidence supports the ALJ's credibility finding and his characterization of her overall work record as poor.

Plaintiff also objects that the ALJ ignored the possibility that her non-compliance with medication was merely symptomatic of her mental impairment rather than a reflection of the severity of her condition. (Obj'ns at 5.) Non-compliance with medication may be viewed differently in the mental impairment context. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011); *Pate-Fires v.*

---

[6]Plaintiff entered the workforce in 1968 at the age of 19, but earned less than $500 that year and did not surpass $5,000 annual earnings until 1979 when she earned over $6,100. The next year her earnings dipped to just below $5,000; followed by 1981 earnings of less than $1,500; and no earnings in 1982. In 1983 she earned a little over $2,500 before her earnings dropped to just over $1,500 in 1984 and just under $500 in 1985. Her earnings almost reached $10,400 in 1986. But they fell to about $3,700 the next year before leveling off in the $8,000 to $9,000 range for 1988 and 1989. From 1990 to 2003 her earnings ranged from just over $13,000 to about $28,500, except for 1995 earnings of $4,000 and 1996 earnings of $3,300. During her last two years of employment, 2004 and 2005, she earned about $18,000 and $11,000 respectively.

*Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009).  But that does not detract from the substantial evidence provided by Plaintiff's own admission of deceptive acts.  And Plaintiff, furthermore, points to no evidence of record to support finding that her non-compliance was due to her mental illness itself.  As noted in the preceding paragraph, Plaintiff avoided excess absences for her two-year probationary period.  That exhibits an ability to control her conduct despite her mental impairments.  The non-compliance does not appear merely attributable to her mental illness.

For the foregoing reasons, the Court finds that the ALJ properly evaluated Plaintiff's credibility.  It overrules the objections concerning her credibility.

### B.   Listing 12.04

Based upon a psychological opinion of George R. Mount, Ph.D., the ALJ found that Plaintiff satisfied Listing 12.04 as of the date of his evaluation, March 3, 2010, but not earlier.  (Tr. at 28.)  The ALJ found that, as of March 3, 2010, Plaintiff's mental impairments had deteriorated to such an extent that she had marked difficulties in maintaining "(1) social functioning and (2) concentration, persistence or pace."[7]  (Tr. at 30.)  This finding is supported by the Psychiatric/Psychological Impairment Questionnaire ("PPQI") completed by Dr. Mount.  (*See* Tr. at 596-603.)  Dr. Mount concluded that Plaintiff was markedly limited in six of eight mental activities related to sustained concentration and persistence and three of five mental activities related to social interactions.[8]  (Tr. at 599-600.)

---

[7]Listing 12.04(B), the only part of the listing at issue in this case, requires that Plaintiff's bipolar disorder result in at least two of the following: (1) Marked restriction of activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; (4) Repeated episodes of decompensation, each of extended duration.  (*See* Pl.'s Br. at 14; *accord* FCR at 17.)

[8]As part of the PPQI, Dr. Mount assessed Plaintiff's capacity to sustain listed mental activities "over a normal workday and workweek, on an ongoing basis in a competitive work environment." (Tr. at 598.)  As defined in the PPQI, a marked limitation "effectively precludes the individual from performing the activity in a meaningful manner." (*Id.*)

The ALJ further found that during the interim period, i.e., between the alleged onset date of disability (December 14, 2005) and the established onset date (March 3, 2010), Plaintiff had moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, or pace.  (*See* Tr. at 29.)  The ALJ recognized that Dr. Mount suggested a 2004 onset date, but noted that it predated the alleged onset date and was during the time that she engaged in substantial gainful activity.  (Tr. at 28.)  The ALJ declined to accept an earlier onset date because of "the other evidence in this case as discussed above," i.e., earlier in the ALJ's decision.  (*Id.*)  The Magistrate Judge found substantial evidence to support the conclusion that Plaintiff did not satisfy Listing 12.04 prior to March 3, 2010.  (FCR at 19-24.)  Not only did the Magistrate Judge find sufficient supporting medical evidence, but he also noted that Plaintiff had engaged in substantial gainful activity through 2005 and had alleged a December 14, 2005 onset date of disability.  (*Id.* at 23-24.)

Plaintiff criticizes the FCR because the ALJ did not specifically list all of the evidence that the Magistrate Judge found supported the decision.  (*See* Obj'ns at 2.)  The ALJ, however, specifically listed testimony from the medical expert (Alfred G. Jonas, M.D.) as inconsistent with the medical listings criteria during the interim period and also refers generally to other evidence that the ALJ had already discussed.  (Tr. at 28.)  The ALJ had considered medical evidence as it related to Plaintiff's mental impairments and work-related mental abilities assessment during the interim period. (*See* Tr. at 21-24.)  The Magistrate Judge noted that consideration and found substantial evidence to support the ALJ's decision.  (FCR at 19-24.)  That the Magistrate Judge cited to additional treatment records that also supports the decision provides no legitimate basis to object.  Indeed, the Magistrate Judge identified the best evidence of record for finding one element of Listing 12.04(B) satisfied – a PPQI completed by Dr. Mummert, in which the doctor concludes that Plaintiff is

7

markedly limited in four of eight mental activities related to sustained concentration and persistence. (*See* FCR at 22-23; Tr. at 424-25.)  These conclusions compare favorably to similar conclusions by Dr. Mount.[9]  (*Compare* Tr. at 424-25 *with* Tr. at 599-600.)

Plaintiff also contends that the ALJ was required to consider Dr. Mount's retrospective opinion despite a perceived inconsistency between the suggested 2004 onset date and her substantial gainful activity during that time.  (*See* Obj'ns at 2-3.)  This contention ignores the fact that the ALJ did consider the opinion but rejected it as unsupported by the other evidence of record to the extent it set an onset date for disability in 2004.  That the ALJ and the Magistrate Judge noted Plaintiff's substantial gainful activity at the time of the suggested 2004 onset date provides no legitimate basis for objection.

Citing *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 1997), Plaintiff lastly objects that "[t]he ALJ's brief analysis at step three cannot withstand close scrutiny." (Obj'ns at 3.)  But the Magistrate Judge appropriately and adequately stated why *Audler* does not dictate a different outcome in this case.  (FCR at 18-19.)  As pointed out by the Magistrate Judge, the ALJ identified the applicable medical listing (12.04) and provided a lengthy discussion of the medical evidence that supported his conclusion.  (*See id.*)  And the Magistrate Judge properly recognized that *Audler* applies a harmless error analysis rather than requiring procedural perfection.  (*See* FCR at 18.)  This harmless error analysis indeed appears to have prompted the Magistrate Judge's citation of treatment records not cited by the ALJ to support his decision.  *Audler* provides no adequate basis for objection.

---

[9]As recognized by the Magistrate Judge, the ALJ ultimately rejected these opinions by Dr. Mummert.  (FCR at 23.)  But even if accepted, they only support one of the four elements in Listing 12.04(B).  (*See id.*)  Unlike Dr. Mount, Dr. Mummert found no marked limitations for any mental activity related to social interactions.  (*Compare* Tr. at 425 *with* Tr. at 600.)

8

The Court does not doubt the validity of retrospective medical opinions. *See Booker v. Astrue*, No. 3:10-CV-1940-P-BF, 2011 WL 4031096, at *7 (N.D. Tex. Aug. 15, 2011) ("Retrospective medical opinions are valid."), *recommendation accepted*, 2011 WL 4048408 (N.D. Tex. Sept. 12, 2011).  But such opinions "must refer clearly to the relevant period of disability and not simply express an opinion to the claimant's current status." *McLendon v. Barnhart*, 184 F. App'x 430, 432 (5th Cir. 2006) (per curiam).  And "[r]ecords describing a claimant's current condition cannot be used to support a retrospective diagnosis of disability absent evidence of an actual disability during the time of insured status." *Id.*  Although "properly corroborated retrospective medical diagnoses can be used to establish disability onset dates," *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997), substantial evidence supports the ALJ's rejection of the 2004 onset date set out in the retrospective medical opinion of Dr. Mount.  Substantial evidence, furthermore, supports the conclusion that Plaintiff's mental impairments did not satisfy Listing 12.04 until March 3, 2010.  As found by the Magistrate Judge, *Likes* does not dictate a remand for further consideration of this Step 3 issue under the circumstances of this case.

For the foregoing reasons, the Court finds that the ALJ properly found that Plaintiff did not satisfy Listing 12.04 until March 3, 2010.  It overrules Plaintiff's objections regarding Listing 12.04.

### C.   Evaluating Opinions of Treating Psychiatrist

Plaintiff also objects that the Magistrate Judge improperly found that the ALJ was entitled to reject opinions stated by her treating psychiatrist, Dr. Mummert, in a PPQI completed January 27, 2007.  (Obj'ns at 3-5.)  She contends that the ALJ failed to properly consider such opinions.  (*Id.*)

In the January 27, 2007 PPQI, Dr. Mummert set out her (1) diagnosis (Bipolar Disorder I, mixed); (2) multiaxial evaluation; (3) prognosis (fair); (4) clinical findings to support the diagnosis;

9

(5) Plaintiff's primary symptoms; and (6) conclusions derived from her evaluation of Plaintiff.  (*See* Tr. at 421-28 (Ex. 12f).)  Although she identified numerous clinical findings, she identified no laboratory or diagnostic test results to demonstrate or support her diagnosis.  (*See* Tr. at 422-23.) She listed Plaintiff's primary symptoms as mood swings, racing thoughts, and sleeping difficulties with mood swings being the most frequent or severe.  (Tr. at 423.)  She found that Plaintiff's bipolar disorder exacerbated her physical symptoms in that Plaintiff may have a decreased pain threshold when she has manic or depressive symptoms.  (Tr. at 427.)  She viewed Plaintiff as unable to tolerate even "low stress" at work and found her impairments likely to produce good and bad days.  (*Id.*)  She estimated that Plaintiff would miss more than three days of work each month due to her mental impairments or treatment.  (Tr. at 428.)

Dr. Mummert opined that Plaintiff was markedly limited in six of twenty listed mental activities:[10] (1) remembering locations and work-like procedures; (3) understanding and remembering detailed instructions; (5) carrying out detailed instructions; (6) maintaining attention and concentration for extended periods; (9) working in coordination with or proximity to others without being distracted by them; and (11) completing a normal workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 424-26.)  She found Plaintiff mildly or moderately limited in other listed abilities,[11] except that the available evidence did not permit her to rate Plaintiff's "ability to be

---

[10]Dr. Mummert assessed Plaintiff's capacity to sustain each of the twenty listed mental activities "over a normal workday and workweek, on an ongoing basis in a competitive work environment."  (Tr. at 423.)  As defined in the PPQI, a marked limitation "effectively precludes the individual from performing the activity in a meaningful manner."  (*Id.* at 424.)

[11]As defined in the PPQI, a moderate limitation "significantly affects but does not totally preclude the individual's ability to perform the activity" whereas a mild limitation has no significant effect on the person's ability to perform the activity.  (Tr. at 423.)

aware of normal hazards and take appropriate precautions." (*See id.*) She identified August 30, 2006, as "the earliest date that the description of symptoms and limitations in [the PPQI] applies." (*Id.* at 428.)

The Court must decide whether the ALJ improperly rejected Dr. Mummert's opinions that, as of August 30, 2006, Plaintiff was markedly limited in several work-related mental activities and was incapable of even low stress jobs or enduring full-time employment on a sustained basis without frequent absences. The ALJ specifically considered these opinions, but noted that he was "not bound to accept even a treating physician's conclusion as to functional capacity or disability, particularly when the opinion is not supported by detailed, clinical diagnostic evidence." (*See* Tr. at 23 (citing 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p and 96-7p).) He also stated that (1) the record contained "no indication that Dr. Mummert, a resident supervised by a fully licensed psychiatrist, was aware of the entire body of medical evidence in this case;" (2) she did not prepare the PPQI "for legitimate medical purposes of diagnosis or treatment or in the course of an[] exam;" (3) she did not relate any cited clinical observation or subjective complaint to the proposed limitations; and (4) the attending psychiatrist did not endorse the PPQI. (*See id.*) The ALJ further noted that (5) the limitations first became applicable on August 30, 2006, about two years after Plaintiff's alleged onset date of disability;[12] (6) contemporaneous medical records (Exhibit 10F) showed brief hospitalizations in August and September 2006 associated with non-compliance with medication;[13] (7) subsequent medical records (Exhibits 13F, 14F, and 18F) showed a stable condition with "subjective complaints

---

[12]Because Plaintiff alleges an onset date of December 14, 2005, the ALJ apparently miscalculated the elapsed time when he stated two years.

[13]Exhibit 10F contains medical records from Harris Methodist Springwood ("Springwood") dated August and September 2006. (*See* Tr. at 374-412.)

usually discounted by the psychiatrist's assessments and clinical observations;"[14] and (8) in January 2007, the psychiatrist was adjusting Plaintiff's medications and upon attaining a proper medication regimen, the severity of her symptoms decreased, her concentration and functioning increased, and she was stable without depression within eight months.  (*Id.*)

Under the applicable regulations, the ALJ must consider and weigh the medical opinions[15] of Dr. Mummert.  *See* 20 C.F.R. §§ 404.1527(b), 416.927(b) (both stating that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive"); 20 C.F.R. §§ 404.1527(c), 416.927(c) (both stating "[r]egardless of its source, we will evaluate every medical opinion we receive").  These regulations provide a six-factor detailed analysis to follow unless the ALJ gives "a treating source's opinion controlling weight."  20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).[16]  When a treating source has given an opinion on the nature and severity of a patient's impairment, such opinion is entitled to controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with" other substantial evidence.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting

---

[14]Exhibit 13F contains medical records from John Peter Smith Health Network ("JPS") from January 2006 to May 2007.  (*See* Tr. at 430-80.)  Exhibit 14F contains some records also contained in Exhibit 13F and JPS medical records from June to October 2007.  (*See* Tr. at 482-519.)  Exhibit 18F contains JPS medical records from November 2008 to March 2009.  (*See* Tr. at 574-81.)

[15]As the regulations explain to claimants:  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  The regulations reserve some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulations.  20 C.F.R. §§ 404.1527(d), 416.927(d).

[16]These factors are:  (1) the examining relationship; (2) the treatment relationship, including the length of time the physician has treated the claimant, the frequency of examination by the physician, and the nature and extent of the treatment relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any others factors brought to the ALJ's attention.  20 C.F.R. §§ 404.1527(c), 416.927(c).

*Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting 20 C.F.R. § 404.1527(d)(2)). And "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [the regulations]." *Id.* at 453. In addition, "if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Id.*

The ALJ accurately noted that the opinions of Dr. Mummert stated in her PPQI are "not supported by detailed, clinical diagnostic evidence." (Tr. at 23.) Although the doctor identifies several clinical findings to support her diagnosis of bipolar disorder, she identifies no laboratory or diagnostic test results that demonstrate or support the diagnosis or the limitations resulting from the disorder. (*See* Tr. at 421-28.) She also does not explain her conclusion that Plaintiff was unable to handle even low stress jobs. (*See* Tr. at 427.) Nor does she explain how or why she estimated that Plaintiff's impairment or treatment would likely result in more than three absences from work a month on average. (*See* Tr. at 428.) The lack of support from medically accepted clinical and laboratory diagnostic techniques provides an adequate reason to not give the opinions of Dr. Mummert controlling weight.

But when an ALJ finds that opinions of a treating source are not entitled to controlling weight, he or she must consider the six factors set out in the regulations to properly assess the weight to be given to the opinions. *Newton*, 209 F.3d at 456. For good cause shown, an ALJ may assign little or no weight to an opinion from a treating source. *Id.* at 455-56. "Good cause may permit an

ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456.

The Magistrate Judge recognized that the ALJ did not provide a detailed analysis of the six required factors, but found such analysis not required because the ALJ cited competing first-hand evidence that contradicted the opinions of Dr. Mummert. (*See* FCR at 28.) *Newton* indeed eliminates the requirement to provide a detailed analysis when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." 209 F.3d at 458. But, in this case, the ALJ did not find that any doctor's opinions were more well-founded than those of Dr. Mummert. The ALJ instead cited to Exhibits 10F, 13F, 14F, and 18F as support for not accepting the opinions of Dr. Mummert.

The ALJ cites to Exhibit 10F to show that Plaintiff's hospitalizations in August and September 2006 were brief and associated with non-compliance with prescribed medication. During her overnight hospitalization from August 31 to September 1, 2006, Plaintiff had reported that she had not taken her medications for a week or so. (*See* Tr. at 401.) During her later four-day hospitalization (admitted on September 26, 2006, and discharged on September 29, 2006), one record notes that her Lithium level was low. (*See* Tr. at 377.) However, nothing in Exhibit 10F otherwise suggests that medication non-compliance resulted in that hospitalization. (*See* Tr. at 375-93 (records from that hospitalization).) In fact, part of the recommended treatment was to increase her medication dosage. (*See* Tr. at 392.) Such increases may indicate that the medication dosage was insufficient rather than indicating a failure to comply with prescribed medication. Most importantly, nothing in Exhibit 10F contradicts the opinions stated in the January 27, 2007 PPQI.

14

The ALJ cites Exhibits 13F, 14F, and 18F to support his finding that JPS records subsequent to the August and September 2006 hospitalizations show that Plaintiff's mental condition was stable and that psychiatric assessments and clinical observations usually discounted her subjective complaints. (Tr. at 23.) These JPS records include a standard form that records subjective information provided by the patient, including compliance with medication; objective ratings by the physician of symptoms and problems;[17] and the physician's assessment and diagnosis. (*See* JPS Medical Records dated March 24, 2009, (Tr. at 574-75); January 8, 2009, (Tr. at 576-77); November 20, 2008, (Tr. at 580-81); October 18, 2007, (Tr. at 518-19); August 30, 2007, (Tr. at 502-03); July 19, 2007, (Tr. at 508-09); June 5, 2007, (Tr. at 514-15); May 3, 2007, (Tr. at 432-33); March 28, 2007, (Tr. at 437-38); February 28, 2007, (Tr. at 441-42); January 31, 2007, (Tr. at 445-46); November 22, 2006, (Tr. at 449-50); October 25, 2006, (Tr. at 452); September 6, 2006, (Tr. at 455-56); August 30, 2006, (Tr. at 462-63).) Except for the records of June 2007,[18] these records consistently show that JPS examiners, including Dr. Mummert, rated Plaintiff's symptoms and problems as moderate or less when the examiners provided ratings. But, while these objective ratings provide some information about the perceived severity of impairments, the seven-point scale provides little insight into what the numbers actually mean with respect to (1) mental restrictions or limitations resulting from the impairments and (2) what the patient can still do despite her impairments. Despite the objective

---

[17]The JPS records use a seven-point scale for the physician to rate a patient's symptoms and his or her problems with daily activities, relationships, and social functioning. (*See, e.g.*, Tr. at 432, 449, 463, 470, 473, 475.) The records instruct physicians to use 1 to designate no symptoms or problems, 4 to indicate moderate symptoms or problems, and 7 to indicate extremely severe symptoms or problems.

[18]Plaintiff exhibited extremely severe depression and insomnia on June 5, 2007, resulting in outpatient care at the Tarrant County Hospital District. (*See* Tr. at 513-15, 535-45.) The attending physician did not rate Plaintiff's daily activities, relationships, or social functioning. (Tr. at 514.) Her condition had improved significantly and she exhibited only moderate depression and less than moderate insomnia upon her discharge on June 6, 2007. (Tr. at 540.)

15

ratings, the JPS records state no opinion inconsistent with any opinion stated in the PPQI.  These records set out no opinion that contradicts the opinions of Dr. Mummert.

Furthermore, records from Dr. Mummert herself[19] do not fall within the competing first-hand medical evidence exception noted in *Newton* even if they may appear inconsistent with opinions in the PPQI.  When records from the same treating physician appear inconsistent with other specifically stated opinions of that physician, the ALJ may deem the records inconclusive or otherwise inadequate to receive controlling weight, but unless there is "other medical opinion evidence based on personal examination or treatment of the claimant," *Newton* clearly requires the ALJ to "seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)."  209 F.3d at 453.  The competing first-hand medical evidence exception to avoiding the detailed analysis of the six § 1527(c)(2) factors does not contemplate using other evidence from the same physician.  To the contrary, use of such evidence is fully anticipated within two of the six required factors – support for the physician's opinions in the medical evidence of record and consistency of the opinions with the record as a whole.

Under the facts of this case, the ALJ was required to provide a detailed analysis of the six factors.  And the ALJ did not do so.  But even if an ALJ procedurally errs by not more fully considering and weighing the opinions of a treating physician, reversal and remand is only required when the error affects the substantial rights of the claimant.  *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (applying harmless error analysis to a different type of ALJ error); *Singleton v. Colvin*, No. 3:12-CV-0821-BF, 2013 WL 1562867, at *12 (N.D. Tex. Apr. 15, 2013) (applying harmless

---

[19]The JPS records show treatment by Dr. Mummert from August 30, 2006, to March 28, 2007.  (*See* Tr. at 435-57, 462-64.)

16

error analysis to similar error).  Absent an error that affects the substantial rights of a party, admin-istrative proceedings do not require "procedural perfection."  *Taylor*, 706 F.3d at 603.  Procedural errors affect the substantial rights of a claimant only when they "cast into doubt the existence of substantial evidence to support the ALJ's decision."  *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent the procedural error.  *January v. Astrue*, 400 F. App'x 929, 933 (5th Cir. 2010) (per curiam).  For the reasons that follow, the ALJ's consideration and weighing of the opinions of Dr. Mummert has affected the substantial rights of the plaintiff in this action.

For purposes of this case, there is no question that Plaintiff has a severe bipolar disorder.[20] The resulting limitations from that disorder and the onset of such limitations are at issue.  The ALJ found that, as of December 14, 2005, Plaintiff had two work-related mental limitations: "she could not have interaction with the public and she could have only incidental contact with coworkers." (Tr. at 24.)  The ALJ incorporated those limitations into a hypothetical to the vocational expert ("VE") who testified that an individual with those limitations would be unable to perform Plaintiff's past relevant work, but would be able to perform jobs described as data entry or clerical checkers, which exist in significant numbers in the national economy.  (Tr. at 1072-73.)  The VE also testified that, if the hypothetical "individual could not stay on task for a vocationally relevant period of time," then that individual would not be employable.  (Tr. at 1073.)  On cross-examination, the VE further testi-fied that an individual would not be able to perform the identified jobs if the individual was "mark-

---

[20]The medical examiner who testified at the hearing before the ALJ (Dr. Jonas) questioned the bipolar diagnosis. (*See* Tr. at 1043-45.)  The ALJ noted that testimony, (Tr. at 24), but found that Plaintiff "has had severe post-onset impairments, including a diagnosis of bipolar disorder," (Tr. at 28).  Moreover, no one argues that Plaintiff does not suffer from a bipolar disorder.

edly limited in the ability to maintain attention and concentration for extended periods of time [and] work in coordination with or proximity to others without being distracted by them." (Tr. at 1074-75.) The ALJ expressly rejected these disabling limitations and relied on the vocational expert to find that Plaintiff was not disabled at Step 5 of the sequential evaluative process. (Tr. at 26-30.)

The monthly JPS treatment notes essentially show a stable mental condition that was rated as no worse than moderately severe except for showing extremely severe depression and insomnia in June 2007. Dr. Mummert rated Plaintiff at her worst when she first sought treatment on August 30, 2006. At that time, Plaintiff had been out of medication, except for Lithium, for one week; had recently pulled a knife on her son; was angry, irritable, and could not sleep; and stated that she "might hurt [her]self or someone else," but Dr. Mummert rated her relationships and social functioning and her symptoms of depression, mood lability, agitation, and irritability as moderate. (*See* Tr. at 454, 462-64.) The next day, Plaintiff was hospitalized through September 1, 2006. (*See* Tr. at 395-412.) On September 6, 2006, Dr. Mummert noted no symptoms or problems, and stated Plaintiff was "now stable on medication." (Tr. at 456.) Less than three weeks later, however, Plaintiff was hospitalized "for suicidal ideation" and depression from September 26 through September 29, 2006. (Tr. at 375-93.) As of November 22, 2006, Plaintiff only had mild mania, depression, and mood lability, in addition to mild problems with daily activities, even though Dr. Mummert noted "questionable compliance with lithium." (Tr. at 449-50.) When Dr. Mummert completed the PPQI on January 27, 2007, she assessed six mental activities of Plaintiff as markedly limited in the context of her capacity to sustain the activities on an ongoing basis in a competitive work environment, (*see* Tr. at 423-26), despite previously rating Plaintiff's symptoms and problems as moderate or less.

Just four days later, on January 31, 2007, Dr. Mummert rated Plaintiff's notable symptoms

18

of depression, irritability, and mood lability as less than moderate.  (Tr. at 445.)  Dr. Mummert continued rating Plaintiff's symptoms and problems as less than moderate in February and March 2007.  (*See* Tr. at 437 and 441.)  In May 2007, a different JPS physician (Dr. Wu) rated Plaintiff's problems with daily activities and social functioning as moderate and all noted symptoms as moderate or less.  (Tr. at 432.)  Treatment notes from June 2007 show extremely severe depression and insomnia that resulted in outpatient care at a local hospital.  (*See* Tr. at 432, 543.)  Treatment notes from July, August, and October 2007 either show Plaintiff was symptom free or the physician chose not to rate the symptoms.  (*See* Tr. at 502, 508, and 518.)  The October 2007 notes, nevertheless, show moderate relationship and social functioning problems.  (Tr. at 518.)  In November 2008 and January 2009, Plaintiff described her symptoms as minimal or less and the physician rated her then "current psychiatric syndromic severity" as "Borderline ill" – a rating that falls just between "Not ill" and "Mildly ill."  (Tr. at 577, 581.)  In March 2009, Plaintiff described the severity of her symptoms as moderate and the record is illegible regarding the severity rating.  (Tr. at 574-75.)

Despite the apparent stability and rated severity of the mental condition in the treatment notes, the nature of Plaintiff's bipolar disorder, *see Cline v. Astrue*, 577 F. Supp. 2d 835, 850 (N.D. Tex. 2008) (citing American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* at 386 (Text Revision 4th ed. 2000) and recognizing that such a disorder "fluctuates between manic and depressive states with periods of apparent stability"), requires examiners to look beyond specific symptoms on a given day.  Individual treatment notes may be misleading regarding the severity of a bipolar disorder because they provide ratings of symptoms and problems at specific moments in time.  Such monthly ratings, moreover, reveal little about the mental limitations resulting from the impairments.  The January 2007 PPQI, on the other hand, clearly sets forth specific

19

mental limitations resulting from a three-month longitudinal study of Plaintiff from the date Dr. Mummert first treated her on August 30, 2006, through November 22, 2006, the date of her last monthly treatment before the PPQI. (*See* Tr. at 421.)

At most, the monthly JPS records merely provide medical data and ratings that might be interpreted as inconsistent with the specific limitations and other opinions in the PPQI. Even this possibility, however, fails to distinguish between the PPQI limitations and the data and ratings of the monthly treatment notes, which are more akin to rating the severity of the impairment at Steps 2 and 3 of the evaluative sequence than assessing the mental RFC of the claimant at Steps 4 and 5. *See Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011) (discussing differences between the severity ratings used for Steps 2 and 3 purposes and the mental RFC assessment of specific limitations or restrictions necessary for Steps 4 and 5). Although the monthly ratings are useful for Steps 2 and 3, the PPQI provides a longitudinal review of Plaintiff so as to express specific opinions about mental limitations and restrictions that are pertinent at Steps 4 and 5. Consequently, the treatment notes do not constitute substantial evidence to support rejecting the specific opinions stated in the PPQI.

Nothing in the JPS records contradict Dr. Mummert's opinions that Plaintiff was markedly limited in several work-related mental activities and was incapable of even low stress jobs or enduring full-time employment on a sustained basis without frequent absences. In fact, until March 3, 2010, when Dr. Mound completed his PPQI, no other physician had rendered opinions regarding the specific mental limitations caused by Plaintiff's impairments on or after August 30, 2006 – the earliest onset date for the limitations accepted by Dr. Mummert. And to the extent the opinions of Dr. Mound differ from those of Dr. Mummert, the differences mostly support even more severe

limitations.  (*Compare* Tr. at 421-28 *with* Tr. at 596-603.)

Had the ALJ conducted the detailed analysis of the six factors required by the regulations, he would have recognized that Dr. Mummert – a specialist in psychiatry – treated Plaintiff for a bipolar disorder on a monthly basis from August through November 2006 before completing a PPQI wherein the specialist opined that Plaintiff's mental activities were markedly limited in six areas and moderately limited in nine areas.  He would have recognized that Dr. Mummert continued to treat Plaintiff for the same condition through March 2007 before other JPS personnel resumed treatment. The ALJ would have noted that Dr. Mummert consistently rated Plaintiff's problems and symptoms as moderate or less, but that these ratings were qualitatively different from what mental limitations Plaintiff may or may not suffer from her bipolar disorder.  The ALJ would have noted that the other JPS physicians rated Plaintiff's symptoms and problems the same as or more severe than Dr. Mummert, but they stated no opinion contradictory to the limitations set out in the PPQI.

To reject the PPQI opinions without a contrary opinion from a treating or examining source would require usurping the physicians' role.  *See Newton v. Apfel*, 209 F.3d 448, 453-58 (5th Cir. 2000).  That is neither the role of the ALJ nor this Court.  Neither the courts nor ALJs may rely on their own medical opinions as to the limitations presented by a claimant's impairments.  *See Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (reversing decision to deny benefits when the ALJ impermissibly relied on his own medical opinions as to the limitations presented by the claimant's impairments).

As in *Newton*, "[t]his is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another."  *See* 209 F.3d at 458.  Nor is this "a case where the ALJ weighs the treating physician's opinion on disa-

bility against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *See id.* The ALJ did not reject the mental limitations found by Dr. Mummert due to any inconsistency with any other psychological opinion. Instead, the ALJ appears to have interpreted the medical data and the JPS ratings to find the limitations unsupported. The ALJ discounts Dr. Mummert's opinions based upon his view that contemporaneous records showed medical non-compliance and that subsequent records (many from Dr. Mummert) show stability with proper course of medication. But "an ALJ is not qualified to interpret raw medical data in functional terms." *Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446 (1st Cir. 1991) (per curiam). And the ALJ took no steps to secure a later opinion from Dr. Mummert, another JPS psychiatrist, or even a consultative examiner related to the mental limitations of Plaintiff. At best, the record before the ALJ was inconclusive with respect to the limitations resulting from Plaintiff's mental impairments. Accordingly, the ALJ should have sought clarification or additional evidence from the treating physician or a consultative examiner in accordance with 20 C.F.R. §§ 404.1512(e) and 416.912(e).

In his hypothetical to the VE, the ALJ included only two limitations resulting from Plaintiff's mental impairments although the opinions of Dr. Mummert support others. Under a de novo review of the administrative record, the Court finds that the ALJ improperly considered and weighed the opinions of Plaintiff's treating psychiatrist. Contrary to the finding of the Magistrate Judge, Dr. Mummert's specific opinions set out in her PPQI do not appear inconsistent with the record as a whole or unsupported by the medical evidence of record. And there is no good cause to discount the weight of those opinions relative to any other expert. The ALJ failed to perform the detailed analysis required by 20 C.F.R. §§ 404.1527 and 416.927. Had he conducted that analysis and properly con-

22

sidered and weighed the opinions of Dr. Mummert there a realistic possibility that he would have included additional mental limitations in his hypothetical to the VE.  To constitute substantial evidence to support a Step 5 finding of no disability, testimony from a VE must include all mental limitations warranted by the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002); *Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Consequently, this procedural error casts doubt on the existence of substantial evidence to support the decision to deny benefits from August 30, 2006, through March 2, 2010.  Therefore, Plaintiff's substantial rights have been affected by the consideration and weight accorded to the opinions of Dr. Mummert by the ALJ.  This procedural error is not harmless.

For the foregoing reasons, the ALJ improperly rejected opinions stated by Plaintiff's treating psychiatrist, Dr. Mummert, in the PPQI completed January 27, 2007.  The Court thus rejects the FCR as it relates to evaluating and weighing those opinions.

**D.    Vocational Expert Testimony**

Plaintiff next objects that the ALJ improperly relied on flawed vocational expert testimony to support his Step 5 denial.  (Obj'ns at 6.)  She contends that the ALJ should have incorporated the limitations from Dr. Mummert into the hypothetical questions to the VE.  (*Id.*)  As noted in the previous section, the failure to properly consider the opinions of Dr. Mummert does call into question the mental limitations included in the hypothetical questioning.  Consequently, for the second part of the interim period, i.e., from August 30, 2006, through March 2, 2010, the ALJ erred in relying on the testimony from the VE.  And that error has affected Plaintiff's substantial rights.

But the failure to properly consider the opinions of Dr. Mummert has had no impact on the mental limitations of Plaintiff prior to August 30, 2006.  That failure thus has no detrimental impact

on the hypothetical questioning regarding jobs that Plaintiff could have worked prior to August 30, 2006. The ALJ, nevertheless, cites no medical support for the two mental limitations he included in his hypothetical questioning – no interaction with the public and only incidental contact with coworkers. (*See* Tr. at 21-24.) He cited some JPS records from early 2006, but ultimately concluded that "the notes lack clear, explicit objective observations and findings necessary to facilitate meaningful functional capacity assessments." (Tr. at 22.) He then recognized that "Dr. Tarakumar B. Reddy conducted a consultative psychiatric exam [on] June 28, 2006 to formally access claimant's state of mental health and any possible work-related mental limitations." (*Id.*) But he included no limitations regarding concentration or pace or persistence even though he recognized that Dr. Reddy had noted that Plaintiff had poor concentration and slow pace and persistence. (Tr. at 22, 370.) The ALJ finished his review of medical record as it related to Plaintiff's mental impairments and work-related mental abilities assessment by noting testimony of the medical expert (Dr. Jonas) and explaining why he gave little, if any, weight to the opinions of Plaintiff's treating physician (Dr. Hill) and her treating psychiatrist Dr. Mummert. (Tr. at 22-24.) The ALJ makes no attempt to connect any medical record to the two mental limitations included in his hypothetical.

Notably, the ALJ also failed to recognize a Psychiatric Review Technique ("PRT") (Exhibit 4F) or Mental Residual Functional Capacity Assessment ("MRFC") (Exhibit 5F) completed on March 6, 2006, by State Agency Medical Consultant Jim Cox, Ph.D. (*See* Tr. at 18-31.) Dr. Cox assessed Plaintiff's mental health from November 1, 2004, to March 6, 2006, and found (1) moderate difficulties in maintaining concentration, persistence, or pace and (2) mild restriction of activities of daily living and in maintaining social functioning. (Tr. at 350, 360.) In the MRFC, Dr. Cox assessed Plaintiff's abilities in twenty mental activities and noted that Plaintiff was moderately

limited in the ability to (3) understand and remember detailed instructions; (5) carry out detailed instructions; (6) maintain attention and concentrate for extended periods; (7) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (11) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (12) interact appropriately with the general public; (14) accept instructions and respond appropriately to criticism from supervisors; and (17) respond appropriately to changes in the work setting. (Tr. at 364-65.)

A review of the medical evidence supports including more than the two mental limitations included in the ALJ's hypothetical question to the VE. ALJs are required to consider all of a claimant's limitations, including those set out in a PRT. *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *15 (N.D. Tex. Feb. 9, 2011). A failure to do so constitutes reversible error. *Id.*

For the foregoing reasons, the ALJ improperly relied on flawed vocational expert testimony to support his Step 5 denial. The Court thus rejects the FCR as it relates to testimony of the VE.

## IV.    Conclusion

Having conducted a de novo review of all relevant matters of record in this case, including the Findings, Conclusions, and Recommendation of the United States Magistrate Judge and the filed objections, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(3), the Court hereby finds that the Findings and Conclusions of the Magistrate Judge are partially correct as stated herein. To that extent, the Court accepts the findings and conclusions as the findings and conclusions of the Court. It otherwise rejects the findings and conclusions and **REVERSES** the decision of the Commissioner to deny Supplemental Security Income and Disability Insurance Benefits to Plaintiff

Sharon Diane Howeth.  For the reasons stated herein, the Court **REMANDS** this action for further

consideration consistent with this order.  If the Commissioner determines that the opinions of Dr.

Mummert are inconclusive or otherwise inadequate to receive controlling weight, the Commissioner

shall seek clarification or additional evidence in accordance with 20 C.F.R. §§ 404.1512(e) and

416.912(e).

     **SO ORDERED this 24th day of February, 2014.**

**JORGE A. SOLIS**
**UNITED STATES DISTRICT JUDGE**